GUARANTY STATE BANK OF TIMPSON v.
WM. D. CLEVELAND & SONS et al.
(No. 235.)

(Court of Civil Appeals of Texas. Beaumont.
May 25, 1917.   Rehearing Denied
June 13, 1917.)

1. NOVATION ⊚⟹1—DEFINITION.

"Novation" is the execution of a new obligation for an existing one either between the same or different parties, the consideration being the discharge of the old contract (citing Words and Phrases, Novation).

[Ed. Note.—For other cases, see Novation, Cent. Dig. § 1.]

2. NOVATION ⊚⟹12—WHAT CONSTITUTES.

Where railroad bills of lading covering cotton shipped to brokers were assigned to a bank for advances made to the shipper, evidence that the bank liquidated the debt due it by the shipper upon his indorsing to it notes payable to him, and that the bank expected to realize from such notes, establishes a novation preventing the bank from recovering against the brokers for a sale of the cotton authorized by the shipper but not by the bank.

[Ed. Note.—For other cases, see Novation, Cent. Dig. § 12.]

Appeal from Harris County Court; Murray B. Jones, Judge.

Action by the Guaranty State Bank of Timpson, Texas, against Wm. D. Cleveland & Sons and others. Judgment for defendants, and plaintiff appeals. Affirmed.

Woods, King & John, of Houston, for appellant. T. S. Taliaferro, of Houston, for appellees.

BROOKE, J. This was a suit by appellant against appellee to recover $281.48 by reason of the alleged breach of contract, whereby appellees, as cotton factors, agreed with appellant to hold 56 bales of cotton until ordered sold by appellant; appellees having sold said cotton on March 9, 1914, without authority from appellant, and said cotton having thereafter advanced 1¹/₁₆ cents per pound by the 23d day of May, 1914, during the same cotton season, to the damage of appellant in the sum above set out.

J. C. Bogard, on the 29th day of December, A. D. 1913, shipped to appellee 56 bales of cotton from Timpson, Tex. The cotton was shipped over the Houston East & West Texas Railway Company, said railway company issuing a bill of lading to J. C. Bogard to "shipper's order, W. D. Cleveland & Sons, consignees." The bill of lading bore on its back the blank indorsement of J. C. Bogard. On December 30, 1913, the following day, J. C. Bogard notified appellee by letter as follows:

"Messrs. W. D. Cleveland & Sons, Houston, Texas—Gentlemen: Yesterday I loaded out 56 bales of cotton for you, which will go through the Guaranty State Bank.   Please store my cotton where it will keep perfectly dry and hold same until I instruct you to sell.

"Yours truly,    [Signed]  J. C. Bogard."

On December 29th, plaintiff wrote defendants:

"We inclose you herewith B/L for 56 bales of cotton, weight 26,693 lbs., against which we have made advance.   On receipt of this cotton send us warehouse receipts for same and hold this until we advise you what disposition to make of it.   Please see to it that it is unloaded properly and stored in perfectly dry shed or warehouse where it will not damage.   Please send us receipts as soon as possible, that we may attach to the bill of exchange we hold."

On January 2, 1914, defendants wrote plaintiff:

"We thank you kindly for your letter of the 29th ult. with B/L inclosed covering 56 bales of cotton.   We note you wish the cotton held, so upon arrival we will send you our receipt showing the class and weight, and will hold for your instructions."

"Awaiting your further commands and favors and thanking you again for this shipment, we remain."

On March 9, 1914, appellee sold the cotton upon the authority of J. C. Bogard, who notified W. D. Cleveland & Sons as follows:

"So I want you to exercise your own judgment, and make effort for me, just as you would like to be treated, as if you were selling it for yourselves.   I have been hard hit with the staple this season, and I want you to pull me out on this 56 bale deal."

Cotton having been advanced 1¹/₁₆ cents per pound by the 23d day of May, 1914, appellant seeks to recover the difference in price for what the cotton would have brought had it been held until the 23d of May, and the price at which it was sold on the 9th of March, A. D. 1914. All the money arising from the sale of this 56 bales of cotton was paid to appellant by appellee.

At the close of the evidence, the court instructed the jury to return a verdict for the defendants. A verdict was returned in accordance with such instruction, and judgment on such verdict entered nunc pro tunc on April 13, 1916, as of date February 9, 1916. Appellant filed a motion for new trial on April 13, 1916, which was the same day overruled, appellant excepting and giving notice of appeal to this court, and the case is properly before this court for adjudication.

By the first assignment of error, the action of the lower court is challenged in refusing to instruct the jury to return a verdict in favor of plaintiff, as shown by plaintiff's bill of exception No. 1. The proposition is made that:

"The undisputed evidence showing that defendants, as cotton factors, had contracted with plaintiff to hold the cotton consigned to them until directed to sell by plaintiff; that the legal title to said cotton was vested in plaintiff; that defendants had breached their contract with plaintiff by selling the cotton without instructions of or permission from plaintiff; and that shortly after such sale, and during the cotton season, during which the contract was made, said cotton advanced in price, with the result that it would have been sold for more than it actually was sold for by plaintiff, the difference being the sum of $272.61. It was error for the court to refuse plaintiff's request for an instructed verdict."

The testimony of B. J. Hawthorn, cashier of the appellant bank, was as follows:

"J. C. Bogard brought me a telegram which he received from W. D. Cleveland & Sons stating that they had sold said cotton. I immediately took it up with W. D. Cleveland & Sons, asking them under whose authority the same was made. They reported under the authority of J. C. Bogard, believing, as he was our customer, that we would be satisfied. We never approved the sale. We realized from the sale of said cotton $2,454.74. $2,000 of this was received soon after the cotton was shipped, and the balance of $454.74 about April 13, 1914. This did not liquidate the amount advanced to Bogard, by the bank. It lacked $385.26 of covering such advance to Bogard. The indebtedness of J. C. Bogard to the plaintiff bank was evidenced by bills of exchange properly accepted by J. C. Bogard, and a note. The bills of exchange were as follows: One dated December 16, 1913, for $2,700, payable on demand; another dated December 26, 1913, for $140, payable on demand; a note dated February 4, 1914, for $315.75, payable on demand."

It was further shown by his testimony that was the amount of money the plaintiff bank advanced to Bogard, and that the rate of interest was 10 per cent. per annum; that no bonus was charged to or paid by J. C. Bogard in any way whatsoever, directly or indirectly; that the bank charged J. C. Bogard nothing except interest, as above stated, at the rate of 10 per cent. per annum on the amount of money loaned to him. The testimony of this witness further shows as follows:

"I do not know what J. C. Bogard wrote the defendants in regard to holding said cotton. If he did write defendants to hold said cotton for his instructions, he had no authority to do so, as the cotton was in our hands, and we alone had authority to give instructions concerning it. It is a fact that J. C. Bogard was the owner of the cotton at the time it was shipped to W. D. Cleveland & Sons; but, as to the advance we made on this cotton was really more than it was worth in the market at the time it was shipped, we wanted to hold the cotton in the hope that the market would advance so that we could realize the amount in full that J. C. Bogard owed us. The only interest we had in the cotton was the interest we had in collecting from its proceeds or value the amount J. C. Bogard owed us. The plaintiff bank held no securities whatever to secure the advances of money by said bank to J. C. Bogard, except this cotton."

It is contended that by indorsing the bill of lading to appellant, and receiving an advance thereon, Bogard transferred the legal title to the cotton which had been consigned to Cleveland & Sons by appellant.

In the case of Mercantile Banking Co. v. Landa, 33 S. W. 681, this language is used:

"Appellant's title to the property was based upon an indorsement to it of the bill of lading, and a delivery thereof, which it claimed was made prior to the levy of the writ of attachment. Appellee joined issue on this proposition, and in effect asserted that the bill of lading was not indorsed until after the levy of the attachment. Appellee, in addition, sought to show by evidence of custom that the title to the property remained in the shipper or consignee; and as the property was shipped by Harris, and in effect consigned to him in the bill of lading issued by the railway company, he was the owner. The issue raised by the appellant was: Did it have a title by reason of the indorsement of the bill of lading? And, under the case as presented by its pleadings, if it did not have title by virtue of that fact, then the appellee should recover, and evidence of custom would not aid him in this respect, and the court should not have presented such an issue. The law gives to a transfer by indorsement of a bill of lading, accompanied by a delivery of it, the effect of passing title to the property shipped. Railway Co. v. Heidenheimer, 82 Tex. 199, 17 S. W. 608 [27 Am. St. Rep. 861]. A title thus acquired is as effectual in law as it would be if based upon an express and completed contract of sale."

Therefore it seems that the contention of appellant with reference to the effect of the indorsement upon the bill of lading is sound. However, the testimony does not stop at this point. The cashier of the appellant bank further testified as follows:

"With reference to steps taken by the plaintiff bank to collect the sum of $281.48, sued for in this case, from J. C. Bogard, we received from J. C. Bogard several notes, payable to him, with which upon his indorsement, *we liquidated the amount due us by J. C. Bogard.*" (Italics ours.)

It is urged that the legal effect of the acceptance of these notes indorsed by Bogard released Bogard from his original debt to the bank, to secure which the bill of lading was indorsed, and carried with it a release of all claims of ownership based on the bill of lading. It is necessary that we set out the testimony of the plaintiff bank with reference to this transaction.

Hawthorn, the cashier, testified:

"I have done business with J. C. Bogard for some time. J. C. Bogard is regarded as an honest, upright man, and was considered up to the time of his failure a fairly good business man. In our letter of April 20, 1914, to defendant in this case, when we wrote, 'When we advised you so definitely what we wanted done and that you should have been able to see from the way we wrote you that we were not sure of J. C. Bogard in this case,' I might say we were afraid the very thing would happen to J. C. Bogard that actually did happen, viz. I was afraid he *was going to fail. I did not have a mortgage* on the 56 bales of cotton, but I did have a properly executed bill of exchange by J. C. Bogard, with bill of lading attached, the same being a shipper's order bill of lading, thereby vesting the title in us to said cotton. It is not a fact that J. C. Bogard paid us all that he owed us; and it is not a fact that we are bringing this suit for the benefit of J. C. Bogard, but we are bringing this suit to recover a loss to our bank on account of W. D. Cleveland & Sons having sold said cotton without our instructions or permission."

"It is a fact that J. C. Bogard was the owner of the cotton at the time it was shipped to W. D. Cleveland & Sons; but, as the advances we made on this cotton were really more than it was worth at the time it was shipped, we wanted to hold the cotton in the hope that the market would advance so that we could' realize the amount in value that J. C. Bogard owed us. The only interest we had in the cotton was the interest we had in collecting from its proceeds the amount J. C. Bogard owed us. Plaintiff bank held no security whatever to secure the advances of money by the said bank to J. C. Bogard, except this cotton. In a letter under date of April 20, 1914, B. J. Hawthorn, Cashier, says, 'We handled this cotton, or we were trying to handle it, so we would be perfectly safe, and still not call on Bogard to put up any more than necessary. In fact, we advanced more than we make a practice of advancing, but expected to call on him to put up more margin, whenever the market declined. The facts are

we had and still have every confidence in Bogard morally, but he has gotten in very heavily the past season, and we do not know what will be the outcome, hence our contention in this matter. He has several hundred bales of cotton on hand, and since this cotton was bought all during the early fall there is no telling the average grade, since it all showed up, particularly on account of rains. Now, if he gave you instructions to sell, you have recourse on him if he is solvent," etc.

On February 10, 1914, appellant drew on W. D. Cleveland & Sons by draft for the sum of $2,000, which was accepted on February 11, 1914, and duly paid.

A. S. Cleveland: That appellee wrote appellant on February 11, 1914, as follows:

"We were not expecting you to draw against the 56 bales at the rate of your draft, and under our present rates we are not prepared to advance the amount you require against cotton of the character of your list."

But appellee paid the draft.

The cashier of the bank testified further as follows:

"With reference to steps taken by the plaintiff bank to collect the sum of $281.48, sued for in this case, from J. C. Bogard, we received from J. C. Bogard several notes, payable to him, with which upon his indorsement we liquidated the amount due us by J. C. Bogard. Before those notes matured, J. C. Bogard filed a petition in bankruptcy. We did not file any claim with the referee in bankruptcy to hold him on his indorsement, and to participate in the dividend, because we felt we would realize more out of these notes than we would by filing our claim with the referee. These notes have matured, and we have tried to collect; but we have failed. There is now due us, the plaintiff bank, on these notes $360.55, which amount has been charged off our books."

[1, 2] "Novation" is defined as being the execution of a new obligation for an existing one. It means that, there being a contract in existence, some new contract is substituted for it, either between the same parties, or between different parties; the consideration mutually being the discharge of the old contract. Words and Phrases, vol. 5, p. 4848. It is further defined as follows in 29 Cyc. pp. 1130, 1131:

" 'Novation' is the substitution by mutual agreement of one debtor or one creditor for another, whereby the old debt is extinguished, or the substitution of a new debt or obligation for an existing one, which is thereby extinguished. It is a mode of extinguishing one obligation by the substitution, not of a new paper or note, but of a new obligation, in lieu of an old one, the effect of which is to pay, dissolve, or otherwise discharge it. And so there can be no novation to which the original debtor does not consent, and to which he is not a party; hence, without this consent and promise to pay, a new creditor can have no action against the debtor, because there is no privity between them. This assent on the debtor's part is also essential for the reason that he may have a valid set off against the original creditor, of which he cannot be deprived."

And further:

"To constitute a 'novation,' the creditor must have consented to the discharge of the original debtor, and have accepted the promise of the new debtor. It is not essential that the assent to and acceptance of the terms of novation be shown by express condition to that effect, but the same may be implied from the facts and circumstances attending the transaction and conduct of the parties thereafter."

In the case cited by appellants of Gimble & Son v. King, 43 Tex. Civ. App. 189, 95 S. W. 8, the following language is used:

"Novation is effected by the substitution of a new obligation between the same parties with the intention to extinguish the old one, or by the substitution of a new debtor with the intention to release the old one, or by the substitution of a new creditor with the intent to transfer the rights of the old one to him. Beech on Modern Law of Contract, p. 786."

And further:

" 'The intention of the creditor to discharge the first debtor, to accept of the second in his stead, must be perfectly evident.' Novation can only exist by mutual consent and agreement of all the interested parties, and it is subject to the same rules of evidence that obtain in regard to any other kind of contract. Not only is it necessary to prove that the creditor took a new debtor, but it must be made to appear, in order to release the old debtor, that there was an extinguishment of the old debt and an agreement to look to the new debtor alone. The mere taking of a new debtor for the old debt would not, standing alone, be sufficient to show novation. Pimental v. Marques, 109 Cal. 406, 42 Pac. 159."

In the present case, the language heretofore quoted as being used by the cashier of the appellant bank is subject only to one construction:

"We received from J. C. Bogard several notes payable to him, with which, upon his indorsement we liquidated the amount due us by J. C. Bogard."

And further:

"We did not file any claim with the referee in bankruptcy to hold him on his indorsement and to participate in the dividends, because we felt that we would realize more out of these notes than we would by filing our claim with the referee."

As before stated, there can be no question about what was meant. This liquidation of the amount owed by Bogard was some time after the cotton had been sold by Cleveland & Sons, after the entire transaction had been completed, so far as Cleveland & Sons were concerned. In addition to this, appellant waited perhaps nearly two years before this suit was filed. In view of these facts, we are constrained to hold that there was a complete novation, by which Cleveland & Sons were released from any obligation which they might have been due to the plaintiff bank by virtue of the transaction.

Therefore, after a careful consideration of the appellant's assignments, and of this record, we are driven to the conclusion that appellant has had a fair and impartial trial; that there is no error apparent of record, or to which our attention has been called, which would justify a reversal of this cause. Believing, as we do, that the justice of the case has been met, and finding no error in the action of the lower court in this cause, it is in all things affirmed.